UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                    Case No. 19-cr-20768
                                               Honorable Paul D. Borman

v.

JOHNNIE WATKINS,

        Defendant.
_____/

**MOTION TO SUPPRESS IDENTIFICATION EVIDENCE**

    Johnnie Watkins, Jr., through counsel, moves (1) to suppress certain identification evidence and testimony and (2) to preclude testimony about the witness's confidence about the validity of the identification evidence admitted at trial under Rule 12 of the Federal Rules of Criminal Procedure, the Fifth and Sixth Amendments to the United States Constitution, and other applicable authorities. In support of this motion, he states the following:

(1) The government accuses Mr. Watkins of (1) carjacking, (2) being a felon in possession of a firearm, and (3) brandishing a firearm in furtherance of a crime of violence.

(2) The day after the complaining witness reported a carjacking, Mr. Watkins was placed into a live line-up. The witness identified Mr. Watkins as the carjacker.

1

(3) The procedure used to obtain this identification was impermissibly suggestive and prejudicial.

(4) Because the taint of the inappropriate live line-up utilized cannot be purged, all in-court identification testimony by the complaining witness also should be suppressed.

(5) Mr. Watkins requests an evidentiary hearing, after full disclosure by the prosecution of all documents, and relevant details, regarding identification procedures used in the investigation of this case.

(6) The government does not concur with the relief sought in this motion.

## CONCLUSION

Because the police used unnecessary and prejudicial practices during the live line-up, identification evidence must be suppressed. In addition, the complaining witness should not be permitted to testify about how confident he is in the validity of his identification.

Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/Colleen P. Fitzharris
s/Daniel S. Dena
Attorneys for Johnnie Watkins
613 Abbott St., Suite 500
Detroit, MI 48226
Phone: 313-967-5542

Dated: February 14, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                      Case No. 19-cr-20768
                                              Honorable Paul D. Borman

v.

JOHNNIE WATKINS,

        Defendant.
_____/

**BRIEF IN SUPPORT OF JOHNNIE WATKINS'S MOTION TO SUPPRESS IDENTIFICATION EVIDENCE**

### I.    BACKGROUND

Before Zachary Broder went to the police station to identify the person he claimed stole his car, he knew that the police had a suspect. He had been told the suspect wore two braids, wore jeans and a black hoodie, had bailed from the car during a police chase, and that the police canine had "indicated" on the suspect. Broder overheard that the person arrested was 6'3," and even overheard the suspect's full name. Of the six men in the live line-up, just one man wore braids. Only one man was tall, dark-skinned, and thin. Only two men wore jeans. It was easy--if not certain--that Broder would pick out Watkins. This suggestive identification is unreliable, and should be suppressed.

### A. Call to 9-1-1

On November 9, 2019, Broder calls 9-1-1 and alleges he is the victim of a carjacking. Broder provides a description of one assailant, and describes the assailant as a 6'1" Black male, very thin, with a dark complexion, wearing a black hat or beanie, and also wearing a black jacket and light blue jeans. (Ex. A, 9-1-1 Call).

### B. Officer Morton provided a description of the suspect

Shortly after calling 9-1-1, Wayne State Police Officer Aaron Morton interviews Broder. When asked for a description of the person, Broder begins to describe the assailant as wearing a "coat." (Ex. B., Morton Video, at 11:24.) Ofc. Morton interrupts, "You said that he had a coat. All that we have is that he had a hoodie on." (*Id.*) Although Broder had not previously described the assailant as wearing a hoodie to 9-1-1, Broder then describes the assailant as wearing *both* a black jacket and a hoodie. (*Id.*)

As the interview of Broder progresses, Ofc. Morton volunteers more information about the assailant's appearance. First, he discloses that the police found a suspect. Then, he states that the suspect had "bailed out" of the car. (Ex. B. at 15:15.) Listening to the radio, Ofc. Morton tells Broder, "I'm hearing that we've got another one detained." Within Broder's earshot, Ofc. Morton requests a description of the suspect over the radio. (*Id.* at 25:50.) Another officer responds: "Black male, about 6'3", two braids in his head, black hoodie, blue jeans." (*Id.*) Ofc. Morton then asks Broder, "Does blue jeans sound familiar?" (*Id.*) Broder admits, "I think he was wearing blue jeans, but I wasn't really paying attention." (*Id.*) Upon hearing Broder's response, Ofc.

4

Morton acknowledges that he should not provide any other descriptions of the suspect because he recognizes the risk of "putting a description in [Broder's] head." (*Id.*) Yet—just two minutes later—Ofc. Morton again volunteers that "apparently the dude you saw had a hat on, but he had two braids in his head." (*Id.* at 28:04.)

As Ofc. Morton sits across from Broder, a police officer on the radio requests "the name on the ID." Hearing this, Broder responds, mistakenly believing that the officer requested his information. A second officer then reads Watkins's full name over the radio. (*Id.* at 28:40.) After a few more minutes, Ofc. Morton tells Broder that the police dog "pretty much indicated" at the location where Watkins was arrested. (*Id.* at 35:53.) Over the radio, an officer states that the key fob was found on Watkins's person. (*Id.*)

While on the phone with his parents, Broder makes inferences about the assailant's appearance based on the information provided by Ofc. Morton: "I assume that if you jump out of a moving vehicle, that you look like you jumped out of a moving vehicle." (Ex. B. at 53:55.) Ofc. Morton interrupts Broder's conversation to interject more information to support the conclusion that the police had apprehended the right person, "Well, [Watkins] was sweaty and shit, so obviously he's done something." (*Id.*)

When Broder asks whether or not one can "send a guy to prison just for being sweaty," Morton insists that "I mean, he had your keys on him." (Ex. C, Morton Video 2 at 11:38.) Broder replies, "Well, then that's conclusive evidence as far as I'm concerned." (*Id.*)

5

Officer McCullom arrived and provided Broder the recovered jacket and keys. She asks Broder, "did you actually see their faces, though?" (*Id.* at 31:23.) Broder replies, "Yeah, I did. I looked at him in the face." (*Id.*) Ofc. McCullom offers, "Well we got both of them," further cementing the belief that the suspects in custody were the actual perpetrators. (*Id.* at 32:38.) As Broder attempts to clarify that "[he] only saw one," Ofc. Morton interrupts, "So it's confirmed?" Ofc. McCullom replies, "Yeah." (*Id.* at 32:40.)

### C. Broder posts to Reddit

The following day, Broder goes online to share his story. Broder authors a post on Reddit, a news aggregator and community website, and he warns other Detroiters about the dangers of living in Midtown. (Ex. F)

Broder replies to comments and questions from other users about his experience. Broder mentions that "yes [he is] going to a police line up in about 10 minutes to identify them hopefully." (*Id.*) When a commenter asks why a line-up identification is necessary, Broder replies, and in doing so, expresses his reliance on the information he'd already been provided by Ofc. Morton: "they weren't caught in the vehicle, they bailed out of the moving car and ran. They were chased. but they did say they had my keys on him, so i'm with you. not sure why." (*Id.*)

Broder also shares that he's already spoken to an agent from the FBI, and that the FBI agent shared some information about Mr. Watkins. (". . . FBI is involved, guy who held me up was on probation after just having served a 10 year sentence. then did this. FBI agent told me he'll retire before this guy gets out of jail.") (*Id.*)

6

### D. The Suggestive Live Line-Up

The next day, law enforcement officers invites Broder to attend a live line-up involving five people, including Watkins. By that time, Broder had already learned critical details about the appearance of the suspect. Below is a photo of the five people in the line-up.



(Ex. D, Line-up Photo.)

Watkins is the only person who meets the officers' description of a 6'3" Black male with two big braids in his head and wearing jeans—the description Ofc. Morton gave Broder of the suspect. Of the five people, Watkins is the only one wearing braids

7

in his hair—the rest wear dreadlocks in all lengths. Only one other person was wearing jeans, and he had a notably lighter complexion than the remaining four. Watkins is also the only suspect in the line-up whose pants are torn from the crotch area and down nearly to the bottom. Broder evidently identified Watkins as the perpetrator of the offense.

## II.     LEGAL STANDARD

The identification procedures used by governmental agents may be so impermissibly suggestive as to deny the accused due process. *Simmons v. United States*, 390 U.S. 377, 384 (1968). Courts must suppress the in-court identification of a person when the police have used unnecessary, unduly suggestive procedures. *Foster v. California*, 394 U.S. 440, 442 (1969). Courts must also suppress any out-of-court identifications that were the product of suggestive line-up procedures. *Neil v. Biggers*, 409 U.S. 188, 198–200 (1972). This rule reflects the inherent problems with eyewitness identification, which often requires a witness to testify "about an encounter with a total stranger under circumstances of emergency or emotional stress," and the malleability of a witness's recollection, which "can be distorted easily by the circumstances or by later actions of the police." *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977).

To determine whether a line-up procedure is unnecessarily suggestive, courts must look at the totality of circumstances. *Biggers*, 409 U.S. at 199. An evidentiary hearing is necessary to assess all the relevant factors. *See Watkins v. Sowders*, 449 U.S. 341, 345-46 (1981) ("the prudence of such a hearing has been emphasized by many

decisions in the Courts of Appeals, most of which have in various ways admonished trial courts to use that procedure.").

The Sixth Circuit requires a two-step analysis when a defendant challenges the reliability of the identification procedures. First, the defendant must show that the identification procedure was impermissibly suggestive. *United States v. Meyer*, 359 F.3d 820, 824 (6th Cir. 2004). Second, after meeting that burden, the court considers the reliability of the identification by considering a variety of factors, including (1) the witness's opportunity to view the person at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the witness's prior description of the perpetrator; (4) the witnesses's certainty at the line-up; and (5) the length of time between the crime and the line-up. *Id.* (citing *Neil v. Biggers,* 409 U.S. 188, 199–200).

## ANALYSIS

### A.   The identification procedures were unnecessarily suggestive

Police conduct created an impermissibly suggestive identification. Throughout Broder's interview, Officer Morton repeatedly offered to Broder detailed descriptions of Watkins's appearance. Over police radio, Broder overhears Watkin's full name, and a detailed description of Watkins different from the description Broder provided in his 9-1-1 call. That description included details like Watkins's hairstyle, which Broder had not previously identified. According to Broder, an FBI agent also gave him information—at the least—about Watkins's criminal history, all before Broder went in to identify Watkins. Combined with a line-up procedure where only one person—

9

Watkins—came close to fitting the description of the perpetrator, the identification was impermissibly suggestive.

> B.  The totality of the circumstances show that Broder was influenced by the unnecessarily suggestive proceedings

When considering each of the *Biggers* factors in turn, there is a significant question about whether police conduct influenced Broder's ability to identify the perpetrator accurately. Before Broder went to view the line-up, he had been told that the police had a suspect in custody, that there was evidence that caused him to believe the police had apprehended the correct suspect, what the suspect looked like, and what the suspect was wearing. His identification of Watkins was all but inevitable.

First, Broder told police multiple times that the encounter with the robber was brief. He initially said the assailant ran up to him and wedged his hand in the door. The robber told him to keep his head down, and Broder complied. (*See* Ex. B, Morton Video 1, at 11:00–13.) In a conversation with his mother, Broder explained, "It's so surreal . . . it was like 15 seconds." (Ex. B at 54:40.) Broder's opportunity to view the robber was also hindered by the fact that robbery occurred after dark.

Second, at the time of the robbery, Broder could not pay attention to the appearance of the assailant because he was focused on the gun he said was brandished. The fact that he focused particularly on this is evident from his clear descriptions of the weapon ("It was a black, it looked like a 9mm—it looked like a police gun. It was like a black, like a steel-tipped gun." (Ex. B at 1:30.) He was very clear that he could tell the

10

robber was not holding a BB gun: "No, this wasn't a BB gun, it didn't have an orange tip, it was a real gun . . . it was real as fuck, I could tell." (Ex. C at 11:45).

Third, any accuracy in describing the alleged assailant is undercut by the actions of Officer Morton. Broder described a Black male about 6'1," and wearing a hat, a black coat, and light jeans. (Ex. A, 9-1-1 Call.) Although Officer Morton recognizes the importance of "not putting a description" of any individual in Broder's head, he repeatedly did just that. First, Ofc. Morton elicited specific descriptions of Watkins over a police radio, which Broder could hear. Broder overheard a detailed description of Watkins: A Black male, 6'3", with two big braids in his hair, with a black hoodie and blue jeans. (Ex. B at 25:50.) But there were important details Broder did not tell the 9-1-1 dispatcher. Watkins is two inches taller than the person described over the phone. And Broder did not see the assailant's hair.

Ofc. Morton repeated the description of Watkins when he voluntarily repeated the description he heard over the radio to Broder. Ofc. Morton tried to confirm that Watkins was the assailant by asking Broder, "Do blue jeans sound familiar?" (*Id.*). In response, Broder reiterated that he "wasn't really paying attention," but thought the man was wearing blue jeans. (*Id.*)

Although Broder makes clear that he observed the assailant wearing a hat, Ofc. Morton volunteered that Broder's assailant "had two big braids in his head," and also that he "bailed out of the car" and "looked all sweaty and shit." (Ex. B at 53:55.)

11

Lastly, Officer Morton repeatedly assured Broder that the person described over the radio and in custody was, in fact, the assailant. He said, "I mean, he had your keys on him." (Ex. C. at 11:38). By the time Broder is invited to a live line-up identification, he knew not only to look for the tall, slender Black male he initially described, but also for the 6'3" Black male with two big braids in his hair, blue jeans, and whose clothes appear tattered or worn from bailing out of a vehicle.

As to the fourth and fifth factors, there are no police reports indicating with what confidence or speed Broder positively identified Watkins. Moreover, it appears from the Show-up and Photo Identification Record that Watkins's full name was disclosed at the line-up. Ex. E, Showup & Photo Identification Record) Broder had already overheard Watkins's name over the radio at the time of Watkin's arrest. Indeed, few details about the live line-up process have been disclosed in the written reports. For example, it is unknown if the officers present at the line-up told Broder that the suspect was among the people present. Nor is there information about whether, after making the selection, anyone told Broder that he had picked the "right one." Certainly any such evidence would weigh further in favor of suppression.

### C. Social scientific studies highlight why the procedures used here were problematic

The *Biggers* factors are by themselves insufficient to determine whether or not an identification was impermissibly suggestive or manipulated, and the Court should also consider scientific social studies that highlight best practices for conducting an

identification, as well as what variables can affect the accuracy of a witness's identification and memory. In 2014, the National Academies of Science (NAS) published *Identifying the Culprit*, a comprehensive look at the relevant science related to eyewitness identification. National Academy of the Sciences, *Identifying the Culprit* (2014) (Available at https://www.innocenceproject.org/wp-content/uploads/2016/02/NAS-Report-ID.pdf) (Accessed on February 13, 2020). The report dismantled common misconceptions about the accuracy of eyewitness identification, and makes recommendations to help law enforcement produce more accurate identifications. (*Id.*) The research established that "relatively simple changes in lineup procedures can lead to stronger eyewitness identifications," and conversely, that failure to follow best practices can substantially raise the likelihood of misidentification. (*Id.*)

The NAS's best practices recommendations for police lineups include:

(1) **Double-blind or Blinded Administration.** Police should employ a double-blind or blinded procedure during the identification process to avoid improper confirmation feedback from law enforcement.

(2) **Appropriate type and number of fillers:** Police should construct arrays and line-up identifications to include at least six persons that meet the general description of the crime suspect and do not single out any particular photograph or photographs for identification.

(3) **Neutral Instructions.** The police should advise the witness that the suspect may or may not be in the lineup. The instruction given should make it clear to the witness that he or she does not have to make an identification.

(4) **Confidence Statement.** Police should obtain a confidence statement (i.e., a statement in the victim's or witness's own words) of his or her level of certainty in an identification immediately after the identification has been made.

(5) **Recording:** Video recording of the identification process and the victim's or witness's response to a photographic array should become standard practice. (*Id.* at 22, 103)

In the instant case, it is unclear if *any* of these best practices were followed. First, the police reports are notably silent as to whether or not a double-blind administration of the identification occurred, and whether or not Broder was provided any confirmation feedback.

Second, and as highlighted earlier, Detroit Police Department failed to assemble the appropriate type of "fillers;" that is, Watkins is the only individual in the line-up that matches the descriptions already provided to Broder of a 6'3" Black man with two big braids in his hair, wearing jeans, with indications that he "bailed from a car." Two of the other filler suspects are shorter than six feet, and only Watkins is 6'3." Watkins is the only individual wearing two braids in his head. He is one of just two wearing jeans. No other person in the line-up has clothing—like ripped pants—suggesting they "bailed from a vehicle."

Third, the reports are silent as to whether or not they warned Broder that the suspect may not be present. If the officers acted in accordance with Ofc. Morton's observed behavior on the body cams, it is likely that they instead reaffirmed to Broder that Watkins was the suspect. The report is equally silent as to the fourth recommendation, as there is no note of Broder's confidence level in the identification.

14

Any of these failures to note the circumstances of the identification could have been cured by a video recording, as recommended by the NAS report. No video recording has been provided or appears to exist.

The NAS report also highlights important estimator variables that can impair a witness's visual perception and memory. (NAS Report at 92) For instance, their research suggests that the presence of a weapon captures the visual attention of a witness and impedes the witness's ability to accurately recall other features of the crime event, including facial features of the perpetrator. (*Id.* at 93) High stress and fear, understandably, may also "significantly impair" a witness's ability to identify a perpetrator's physical appearance. (*Id.* at 94) Moreover, studies show that what little a person can remember during stressful events are highly vulnerable to modification by exposure to post-event misinformation. (*Id.* at 95) Witnesses also succumb to own-race bias, a phenomenon where faces of people of different races to the eyewitness are harder to discriminate than are faces of people of the same race as the eyewitness. (*Id.* at 96)

All of the estimator variables mentioned are present throughout, and lean towards a finding that Broder could not have developed an independent accurate description of his assailant. Broder was scared. He was staring down the barrel of a gun for what he described as "15 seconds." Between the stress and fear Broder reasonably felt, it is understandable how his identification of Watkins was manipulated and modified by the actions of Wayne State and Detroit Police Department.

15

Further, Broder appears susceptible to own-race bias. At two points during the interview, Broder expresses incredulity that he—a White person—could be the victim of crime. ("I don't know why anyone would try to rob a White person at gunpoint in Midtown . . .") (Ex. B. at 1:01:00) ("This dude is about to murder a White person in Midtown?") (Ex. C. at 28:30). As Broder describes to his mother his interaction with Wayne State Police Officer Camille McCullom, a Black female police officer, Broder repeatedly refers to Ofc. McCullom using male pronouns, as if he was unable to distinguish even the sex of the Black person that assisted him. (Ex. C, at 54:50-55:23)

The videos and documents submitted as exhibits provide ample reason to conclude that the identification procedure used was suggestive, unnecessary, and create significant doubts about the reliability of Broder's identification. Consequently, this Court should exclude any testimony about the out-of-court identification.

### D. This Court should exclude any in-court identification

When police have used a suggestive identification procedure, to ask a witness to identify a defendant in court, the government must prove by clear and convincing evidence that the previous identification was sufficiently reliable. *United States v. Wade*, 388 U.S. 218, 241 (1967) (analogizing the process in analyzing suggestivity in identification procedures to the approach in considering the taint of a Fourth Amendment violation); *Clemons v. United States*, 408 F.2d 1230, 1246 (1968). Courts

16

weigh the degree of suggestivity and the strength or weakness of the indications of reliability.

An analysis of the reliability factors in the present case – particularly the lack of opportunity of the witness to view the suspect, the limited initial description of Watkins, and the description of Watkins provided to Broder prior to the identification, reveal the unreliability of the witness's identification. As a result, all testimony relating to out-of-court and in-court identifications of Watkins made by Broder should be suppressed.[1]

Where, as here, out-of-court identifications are unduly suggestive and unreliable, the government can elicit in-court identifications only if there is an independent source to support them. *See Wade*, 388 U.S. at 239-241. There is no evidence of a sufficient independent source for in-court identifications. Therefore, once the Court finds the out-of-court identifications unreliable, it should preclude the government from eliciting any in-court identifications in this case.

### IV.   CONCLUSION

Officers should not have told Broder that they had a suspect. At the very least, nobody should have described the suspect's appearance or clothing to him before a line-up. And any line-up that includes only one person who matches the description of the perpetrator is unduly suggestive. This Court should hold an evidentiary hearing to

---

[1] The lack of information in the defense's possession about the circumstances under which the identification procedures were conducted at least entitles Watkins to a hearing on this issue.

learn more about the circumstances of the live line-up. The records available indicate that the identification procedure used was unnecessary and unduly suggestive procedure. The minimal lighting, short period of time, and focus on the weapon undercut Broder's ability clearly to see and accurately to remember the perpetrator's appearance. Because the procedure used was unduly suggestive and unreliable, this Court should suppress any in- and out-of-court identifications.

Respectfully Submitted,

**FEDERAL COMMUNITY DEFENDER**

s/Colleen P. Fitzharris
s/Daniel S. Dena
Attorneys for Johnnie Watkins
613 Abbott St., Suite 500
Detroit, MI 48226
Phone: 313-967-5542

Dated: February 14, 2020

## CERTIFICATE OF SERVICE

Counsel certifies that on the above date, the foregoing paper was filed with the clerk of the Court using the ECF system, which will send notification to opposing counsel.

                Respectfully Submitted,

                **FEDERAL COMMUNITY DEFENDER**

                s/Colleen P. Fitzharris
                s/Daniel S. Dena
                Attorneys for Johnnie Watkins
                613 Abbott St., Suite 500
                Detroit, MI 48226
                Phone: 313-967-5542

Dated:  February 14, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,        Case No. 19-cr-20768
                                  Honorable Paul D. Borman

v.

JOHNNIE WATKINS,

        Defendant.

                                  /

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| A | 9-1-1 Call |
| B | Interview of Zachary Broder by Wayne State Police Officer Morton |
| C | Continued Interview of Zachary Broder by Wayne State Police Officer Morton |
| D | Line-Up Photo |
| E | Showup & Photo Identification Record |
| F | Reddit thread authored by Zach Broder |